UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| DAVID G. DORRANCE, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:12-CV-540-CAN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

On February 22, 2013, Plaintiff David G. Dorrance, Jr., ("Dorrance") filed a Motion for Summary Judgment in this Court requesting reversal or remand of the decision of the Commissioner denying Social Security Disability Insurance Benefits ("DIB"). On February 22, 2013, Dorrance filed his opening brief and, on May 31, 2013, the Commissioner responded. Dorrance filed a reply brief on June 14, 2013. This Court may enter a ruling in this matter based on the parties' consent, 28 U.S.C. § 636(c),and 42 U.S.C. §§ 405(g) and 1383(c)(3).

**I. PROCEDURE**

On July 29, 2009, Dorrance filed an application for DIB and Social Security Insurance ("SSI"), alleging disability due to hearing problems, back pain, degenerative disk disease of the back ("DDD"), bipolar disorder, and depression. Dorrance alleged a disability onset date of February 2, 2007. His claims were initially denied on March 6, 2010, and also upon reconsideration on April 1, 2010. Dorrance appeared before an administrative law judge ("ALJ")

---

[1] Carolyn W. Colvin became the acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d)1 of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as Defendant in this suit.

via video conference on January 31, 2011. There was also a vocational expert ("VE") who testified on that date.

On February 4, 2011, the ALJ issued a decision holding that Dorrance was not disabled, as defined in the Social Security Act. On June 4, 2012 the Appeals Council denied Dorrance's request for review of the ALJ's decision, rendering the ALJ's decision the final decision of the Commissioner. *See* C.F.R. §§ 404.981, 416.1481.[2]

## II. ANALYSIS

### A. Facts

Dorrance was thirty-seven (37) years old at the time of his hearing with the ALJ on his claim. He completed a tenth-grade education and his past prior relevant work includes employment as a car detailer, foreman, general laborer, roofer, tile worker, warehouse worker or weed whacker. Most recently Dorrance attempted to work as an auto detailer at Cambe Chevrolet; however, he needed to stop because he was unable to perform the physical work required. For the purposes of DIB, Dorrance was insured through March 31, 2012.

### B. Medical Background

#### 1. Mental Problems

On November 5, 2007, Dorrance received treatment at the Knox Family Medical Center for depression and was prescribed Cymbalta for his reported history with bipolar disorder. (Tr. 306-07). On September 11, 2009, Dorrance was treated at Porter Starke Services for depressive disorder with anxiety anger issues and lack of motivation. The treating doctor indicated a global

---

[2]The regulations governing the determination of disability for DIB are found at 20 C.F.R. §404.1504 *et. seq.* The SSI regulations are substantially identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et. seq.* For convenience, only the DIB regulations will be cited henceforth in this opinion.

assessment functioning ("GAF") score of 55.³ On October 4, 2010, Dorrance returned to Porter-Starke and was seen by Therapist Jack Garden, PsyD, HSPP. During this visit, Dorrance reported a history of anxiety and depression, difficulty sleeping, lack of motivation, and suicidal thoughts with impression of depressive disorder ruling out alcohol dependence with a GAF of 53 and an outpatient treatment plan. (Tr. 507-10).

On February 2, 2010, Dorrance saw consultative examiner, Nancy Link, Psy. D., who determined his GAF score to be 67. (Tr. 408). Dorrance's WAIS-IV test confirmed extremely low verbal comprehension and low average working memory. (*Id*.) Dr. Link opined that the reported symptoms might be characterized as "creating moderate difficulty in customary activities and living skills." (*Id.*) During this examination, Dorrance recalled three of three items after a delay, performed simple math problems, and subtracted sevens serially (Tr. 399).

On February 2, 2010, Dorrance also saw a non-treating, non-examining State agency reviewer, William A. Shipley, Ph.D. (Tr. 412). Shipley found that Dorrance suffered from moderate difficulties in concentration, persistence, or pace including the ability to understand, remember, carry out detailed instructions, and maintain attention and concentration for extended periods of time. (*Id.*)

### 2. Hearing Loss

Dorrance claims to have suffered hearing loss that caused him to have worn hearing aids since childhood. (Tr. 331). Dorrance's doctor, Deborah A. Novak, MS CCC-A, noted during an

---

³The GAF scale reflects a "clinician's judgment of the individual's overall level of functioning." *See* American Psychological Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed. 2000). A GAF score of 50 indicates that a person suffers from serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.* at 34. A GAF score of 70 indicates that a person has some mild symptoms or some difficulty in social, occupational, or school functioning, but generally is functioning pretty well and has some meaningful interpersonal relationships. *Id.*

examination that Dorrance had behind-the-ear hearing aids that were not functioning well and was only wearing one at the time of the exam. (*Id.*) Notably, on April 10, 2009, Novak ordered audiological testing that showed sensorineural hearing loss (Tr. 337). As a result, Novak concluded that there was severe to profound hearing loss in the right ear and severe sensorineural hearing loss in the left ear. (Tr. 332). At Novak's recommendation, Dorrance got new hearing aids. (Tr. 335). In November 2009, Dorrance returned for a follow up appointment with Novak and complained of reverberation related to his new hearing aids. Novak corrected the reverberation, cleaned the hearing aids, and replaced the tubing and windscreens. Dorrance was pleased with the reprogramming. (*Id.*)

In March of 2010, Dorrance was evaluated by consultative examiner David A. Campbell, M.D., F.A.C.S. (Tr. 426). Dr. Campbell noted that Dorrance had two hearing aids but was only wearing one, which distorted his speech, but did provide some benefit. (*Id.*) However, Dr. Campbell explained that Dorrance's use of only his left hearing aid did not "exhibit enough power to bring him into the speech banana." *Id*. Therefore, Dr. Campbell opined that Dorrance's communication skills and his ability to hold a job were impaired. *Id.*

In November of 2010, Dorrance returned to Dr. Novak complaining of issues with his left aid. (Tr. 479). Novak noted that both aids were "very very dirty," as the result of Dorrance work in the garage. (*Id.*). Novak cleaned the aids and replaced tubing before sending the left aid out for repair. Novak also instructed Dorrance not to wear his hearing aids while working in the garage.

### 3. Back Pain

Dorrance's back pain began as the result of playing sports in high school but had increased in intensity and frequency since then. Around January 2009, Dorrance fell from a

4

horse, which aggravated his low back pain and caused tingling in the buttocks. (Tr. 289). Roman Filipowicz, M.D., treated Dorrance following the incident. Upon examination, Dr. Filipowicz discovered that Dorrance had moderate degenerative disc narrowing of multiple vertebrae with a mild degenerative disc narrowing at another, but stated that everything else appeared to be normal.      In April 2009, Dorrance was examined again by Dr. Filipowicz who found that Dorrance's cranial nerves were intact. Dr. Filipowicz noted that Dorrance's upper extremities showed no weakness, but that his right leg was affected by nerve damage while the left leg was intact. (Tr. 291). Dorrance had some pain in the back when he did hip flexion on the left and extension of the knee, but Dr. Filipowicz noted good strength. Dorrance was also able to move his foot and ankle well; however, knee reflexes were diminished. Dr. Filipowicz stated that Dorrance's sensation in his body was intact. Dr. Filipowicz prescribed medications for Dorrance's back pain. (Tr. 373). At a November 2009 follow-up visit, Dr. Filipowicz noted that Dorrance was "better than the last time" and no longer had drop foot. (Tr. 369). Some weakness was noted but Dorrance was able to stand on his toes and heels. *Id.* Dorrance complained mostly of back pain rather than leg pain. *Id.*

In February 2010, Dorrance visited pain specialist Dr. Ralph Inabnit, D.O. based on Dr. Filipowicz's referral. (Tr. 390). Dr. Inabnit noted that Dorrance's casual walk was normal; the Romberg[4] was negative; his reflexes were symmetrical and normal bilaterally; his finger-to-nose and heel-to-shin were normal; and he could tandem, toe and heel walk. (Tr. 395–96). Dr. Inabnit also stated that the range of motion of Dorrance's cervical spine, upper extremities, hips, knees, ankles, and feet was normal while the range of motion of his lumbar spine was diminished. (Tr.

---

[4] The Rhomberg test is a neurological test used to detect poor balance. "With feet approximated, the subject stands with eyes open and then closed; if closing the eyes increases the unsteadiness, a loss of proprioceptive [positioning] control is indicated, and the sign is positive." *Stedman's Medical Dictionary* 373770 (27th ed. 2000).

5

396). Dorrance's joints were healthy, but Dr. Inabnit recommended that Dorrance refrain from heavy lifting due to his other musculosketal symptoms. (Tr. 397).

On March 3, 2010, as part of Dorrance's disability application process, consultative physician Dr. J.V. Corcoran, M.D. completed a Physical RFC Assessment form in which he opined that Dorrance could lift ten pounds frequently, twenty pounds occasionally and that Dorrance was not limited in any way with regard to pushing or pulling within the aformentioned weight restriction. (Tr. 430–37). Dr. Corcoran also stated that Dorrance could stand and/or walk about six hours in an eight hour workday as well as sit for the same duration of the workday. However, Dr. Corcoran indicated that Dorrance should not climb ladders, ropes, or scaffolds; could only occasionally climb ramps/stairs, balance, stoop, kneel, crouch, or crawl; and should avoid concentrated exposure to noise and hazards, including machinery, unprotected heights, and slippery, uneven surfaces.

In September 2010, Dorrance had surgery to alleviate his pain and back issues. Dorrance had been doing well post-surgery until he fell at home, which caused a small crack in a vertebral body that gave him pain that required treatment. (Tr. 500). On December 27, 2010, Dorrance told Dr. Filipowicz that his back pain had not improved much since the surgery. Dr. Filipowicz opined that Dorrance was "incapacitated from physical labor and will remain as such." (*Id.*)

    **C.**    **Dorrance's Hearing Testimony**

During the January 31, 2011, hearing before the ALJ, Dorrance testified that he had previously been employed as a physical laborer. He reported that he worked as a shear operator for one year before his alleged onset date of February 2, 2007, but could not remember previous jobs. As a shear operative, Dorrance cut plates and regularly lifted over one-hundred pounds.

Most recently, Dorrance worked for three months as a car detailer. Since his alleged onset date, Dorrance had tried several other jobs, but not succeeded.

Dorrance also testified that his existing back problem worsened in 2007 and that he ignored it until he was unable to bend to lift anymore. He rated the pain at that time as an eight out of ten. In 2011, Dorrance arrived at the ALJ hearing with a cane that he had used since his back surgery in 2010. He explained that he switched the cane from side to side depending on the severity of the pain. He also stated that he was not self-sufficient in daily activities. He stated that he used to ride a motorcycle, last tried to golf in 2004, and last worked in the garage in approximately 2006. At the hearing, Dorrance was also wearing hearing aids. Even with hearing aids, he had difficulty hearing conversations as evidenced by his requests that people re-ask questions or speak louder. Dorrance also indicated that he suffered from depression, which he asserted had caused him difficulties in concentration and focusing since 2004.

During his testimony, Dorrance indicated that he could stand for roughly ten minutes, sit about ten to fifteen minutes and was unable to lift a gallon of water. He also stated that he was able to drive fifteen minutes to a local store. Despite having a tenth-grade education, Dorrance acknowledged that he could only read at a fifth grade level.

On December 31, 2009, Dorrance's girlfriend wrote a third party functional report explaining that Dorrance's daily activities were impaired because he was unable to stand for long periods due to the back pain. However, she indicated that he had attempted to help with chores, wash dishes, and vacuum in short intervals. She also noted Dorrance's back pain, attention problems, inability to follow instructions well, and difficulty in sleeping and eating. She

explained that these symptoms caused Dorrance to become easily frustrated, to have bad moods, and to not leave his residence.

>    D.    The ALJ's Decision

The ALJ found that Dorrance had not engaged in substantial gainful employment since his alleged onset date of February 2, 2007. The ALJ found that Dorrance had severe impairments of sensorineural hearing loss and degenerative disk disease of the lumbar spine, but that he did not have an impairment or combination of impairments that met or medically equalled any of those included in the Listing of Impairments at 20 C.F.R. pt. 404, subpt. P, app. 1. The ALJ determined that Dorrance's depression, anxiety, bipolar disorder, history of alcohol abuse in remission, and borderline intellectual function, when taken in combination, were non-severe and caused only mild limitations in Dorrance's activities of daily life and his concentration, persistence, or pace. The ALJ found that Dorrance had the residual functional capacity ("RFC") to perform a limited range of sedentary work that did not require any climbing of ladders, ropes, or scaffolds with only occasional stooping, kneeling, crawling, balancing, crouching, and climbing ramps and stairs. The ALJ further defined Dorrance's RFC to prohibit work where there was concentrated exposure to hazards, slippery or uneven surfaces, or unprotected heights and noise intensity exceeding level three. The ALJ also included a sit/stand option approximately every half hour for five minutes at a time in Dorrance's RFC. Based on that RFC, the ALJ determined that Dorrance could perform the jobs of addressor and parking garage cashier, which existed in significant numbers in the national economy. As a result, the ALJ concluded that Dorrance was not disabled.

>    E.    **Standard of review**

The Social Security Act authorizes judicial review of decisions of the agency. The court will uphold the decision of the agency as long as the ALJ's decision is supported by substantial evidence and free of legal error. 42 U.S.C § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence is more than a scintilla and means such relevant evidence as a reasonable mind might accept to support such a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1972). A reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). An ALJ decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of the evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780,782 (7th Cir. 1997).

The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. The ALJ must consider whether: 1) the claimant is presently employed; 2) the claimant has a severe impairment or combination of impairments; 3) any of the claimant's severe impairments meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; 4) the claimant's RFC leaves him unable to perform his past relevant work; and 5) whether the claimant can perform other work in the national economy given the claimant's RFC, age, education, and experience. *Briscoe*, 425 F.3d at 352; 20 C.F.R. § 404.1520(a)(4)(i)-(v). If the ALJ can find that the claimant is not disabled at any step, he does not go on to the next step. 20 C.F.R. § 404.1520(a)(4).

In his decision, an ALJ must, at a minimum, provide the rationale for his decision or otherwise provide analysis of the evidence in order to allow the reviewing court to trace the path

9

of his reasoning and to be assured that he considered the important evidence. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ is not however required to address "every piece of evidence or testimony in the record," but rather provide some insight into the reasoning behind the decision to deny benefits. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agencys ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott,* 297 F.3d at 595).

### G. Issues for Review

Dorrance contends that (1) the ALJ erred in finding his mental impairments to be non-severe; (2) substantial evidence does not support the ALJ's RFC determination; and (3) the ALJ's step 5 analysis is erroneous.

#### 1. The Severity of Dorrance's Mental Health Impairments

Under the Social Security regulations, an impairment is "severe" if it is one that significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a)-(b). An impairment is not severe when medical and other evidence show only a slight abnormality with no more than a minimal effect on the claimant's ability to work. SSR 96-4p; 96-3p; 85-28. In evaluating the severity of mental health impairments, the ALJ must use a technique whereby he first evaluates "pertinent symptoms, signs, and laboratory findings" to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). If the claimant has a medically determinable mental impairment, then the ALJ must document that finding and rate the degree of the claimant's functional limitations in

10

activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.[5] 20 C.F.R. § 404.1520a(c)(3). Activities of daily living, social functioning, and concentration, persistence, or pace are rated on a five-point scale of none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). Episodes of decompensation are rated on a four-point scale of none, one or two, three, and four or more. *Id.* The ratings in the functional areas correspond to a determination of severity of mental impairment. 20 C.F.R. § 404.1520a(d)(1). If the ALJ rates the first three functional areas as none or mild and the fourth area as none, then generally the impairment is not considered severe. *Id.* Otherwise, the impairment is considered severe, and the ALJ must conduct the Step Three analysis and determine whether the severe impairment meets or equals a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). If the severe mental impairment does not meet or equal any listing, then the ALJ will assess the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).

In his opinion, the ALJ must incorporate the pertinent findings and conclusions used to support his severity decision. 20 C.F.R. § 404.1520a(e)(2). The ALJ must identify any significant medical history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the claimant's mental impairment. The decision must also incorporate "a specific finding as to the degree of limitation in each of the functional areas." *Id*.

In this case, Dorrance alleges that the ALJ erred because she did not correctly classify his mental impairments as severe. Yet, the ALJ provided rationale in her opinion as to why she

---

[5] Decompensation is defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.00; *see also Stedman's Medical Dictionary*, 497 (28th ed. 2006).

determined that the mental impairment was not severe. Specifically, the ALJ considered the four functional areas and commented that Dorrance's medically determinable mental impairment caused no more that mild limitation in his activities of daily living, social functioning, and concentration, persistence or pace with no episodes of decompensation. (Tr. 32). Moreover, the ALJ outlined the results of testing performed by consultative examiner Nancy Link, Psy.D. and explained the inconsistencies between Dr. Link's assessments of moderate limitations and the medical evidence supporting only mild restrictions in daily activities, social functioning, and concentration, persistence, and pace. Therefore, because the ALJ explained her rationale for classifying Dorrance's mental impairment as non-severe and supported her decision with medical evidence, the ALJ built the logical bridge necessary to support her severity decision with substantial evidence.

Even if the ALJ had not supported her conclusion that Dorrance's mental impairments were non-severe, the error would be harmless. As long as an ALJ finds at least one severe impairment, the five-step disability analysis continues. *Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010). Here, the ALJ identified Dorrance's back pain and hearing loss as severe impairments that did not meet a Listing. In so doing, the ALJ propelled the disability analysis forward to an RFC determination which necessarily included consideration of all of Dorrance's impairments, including the non-severe mental impairments. *See id.*; *Brown v. Astrue*, No. 3:07-cv-99-WGH-RLY, 2009 WL 722299, at *10 (S.D. Ind. Mar. 18, 2009). As a result, Dorrance mental impairments were not ignored.

2. **The ALJs's RFC Finding**

As mentioned above, because the ALJ found that Dorrance's severe impairments did not

meet or equal a Listing at Step Three, the ALJ was required to assess Dorrance's RFC in order to proceed to Steps Four and Five of the disability determination process. The RFC is an administrative assessment of the maximum an individual can do despite the limitations imposed by any impairments. 20 C.F.R. § 404.1514(a); SSR 96-8p. An RFC measures not only medically determinable impairments, but related symptoms, such as pain and the side effects of medication. SSR 96-8p. An RFC analysis must include a thorough discussion and analysis of the objective medical evidence and other evidence, including the claimant's testimony regarding pain and functional limitations. *Id.* However, the ALJ must consider only limitations and restrictions attributable to medically determinable impairments. *Id.* Moreover, the RFC assessment must include an explanation describing how the evidence supports the conclusion and how any inconsistencies or ambiguities in the evidence in the case record were considered and resolved. *Id.* Here, Dorrance argues that the ALJ erred in defining Dorrance's RFC because she failed to properly weigh the opinion of Dr. Filipowicz, Dorrance's treating neurosurgeon, and made a credibility determination that was patently wrong.

        **a.**       **The ALJ failed to adequately articulate her reasons for refusing to give controlling weight to the opinion of Dorrance's treating neurosurgeon Dr. Filipowicz.**

In making the RFC determination, the ALJ must determine and articulate the weight applied to each medical opinion. SSR 96-8p. A treating physician's medical opinion is entitled to controlling weight if it is well supported by objective medical evidence and consistent with other substantial evidence in the record. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). The ALJ is not required to give the treating opinion controlling weight. However, the ALJ must provide a sound

13

explanation for a decision to reject the treating physician's opinion and to accept an alternate opinion. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); 20 C.F.R. § 404.1527(c)(2). In addition, the ALJ is not required to detail every reason for discounting a treating physician's report. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). Yet even when an ALJ offers good reasoning for refusing to give controlling weight to a treating physician's opinion, she must still decide what weight to give that opinion. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (citing *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

In addition, the ALJ may not assign a weight without considering the following factors identified in the Social Security regulations: (1) the length, nature, and extent of the physician's treatment relationship with the claimant; (2) whether the physician's opinions were sufficiently supported; (3) how consistent the opinion is with the record as a whole; (4) whether the physician specializes in the medical conditions at issue; and (5) other relevant factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), (c)(3)-(6); *see also Elder*, 529 F.3d at 415; *Clifford*, 227 F.3d at 871. "If the ALJ discounts the [treating] physician's opinion after considering these factors, [the court] must allow that decision to stand . . . ." *Elder*, 529 F.3d at 415 (quoting *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008)). Alternatively, remand may be appropriate if the ALJ discounts a treating physician's opinion without considering these regulatory factors. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

Here, the ALJ gave little weight to the opinion of Dorrance's treating neurosurgeon, Dr. Filipowicz. The ALJ supported this decision by contrasting Dr. Filipowicz's statement with the broad range of Dorrance's continuing activities, including golfing, that suggested sedentary work was an appropriate for Dorrance, despite her agreement with Dr. Filipowicz's statement that

14

Dorrance is unable to perform physical labor. The ALJ prefaced her conclusion by detailing Dorrance's visits to Dr. Filipowicz between April 2009 and December 2010 and by referencing Dorrance's alleged symptoms, diagnoses, medical tests, treatments, progress, and recovery challenges. The ALJ specifically mentioned Dorrance's September 2010 back surgery and subsequent fall from bed that caused another injury, significant back pain, and slow recovery.

While the inconsistency between Dr. Filipowicz's statement and Dorrance's continuing activities may be consequential, the ALJ has not supported her conclusion that Dr. Filipowicz's statement is inconsistent with the record as a whole and worthy of less than controlling weight. For instance, the ALJ did not develop the full context of Dr. Filipowicz's statement, which said that Dorrance "is incapacitated from physical labor and will remain as such." (Tr. 500). In addition, the ALJ chronicled Dorrance's visits with Dr. Filipowicz, but did not clearly show that she considered all of the required regulatory factors. The ALJ did not demonstrate the full nature of Dorrance's relationship with Dr. Filipowicz by failing to identify Dr. Filipowicz's medical specialty or his role, if any, in Dorrance's surgery.

Similarly, the ALJ justified the weight given to Dr. Filipowicz's statement with Dorrance's continuing activities, implying that because Dorrance was able to golf, fish, ride horses, and work in his garage before his surgery despite his back pain, Dr. Filipowicz's statement was inconsistent with the record and not worthy of controlling weight. Yet, the ALJ failed to compare the golfing, fishing, and horseback riding incidents directly to the medical evidence, which may have illuminated the degenerative nature of Dorrance's back problems and changes in Dorrance's activities after his surgery. As a result, the Court cannot effectively trace the path of the ALJ's reasoning.

Therefore, because the ALJ did not adequately articulate her reasoning for refusing to give Dr. Filipowicz's opinion controlling weight and did not demonstrate that he had considered all the required regulatory factors in doing so, the ALJ's RFC determination, which led to the decision to deny disability benefits to Dorrance, is not supported by substantial evidence. Accordingly, this case must be remanded so that the ALJ can reevaluate whether Dr. Filipowicz's opinion about Dorrance's disability is entitled to controlling weight. If on remand, the ALJ still decides that controlling weight should not be given to Dr. Filipowicz's opinion, the ALJ must provide a sound explanation of the decision. *See Roddy*, 705 F.3d at 636–37.

## b. The ALJ's credibility determination was not patently wrong.

In addition to considering medical opinion evidence in determining a claimant's RFC, the ALJ must also consider all of a claimant's symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529. When considering a claimant's symptoms, an ALJ first determines whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's pain or other symptoms. SSR 96-8p. If such an impairment exists, the ALJ must evaluate the intensity, persistence, and functionally limiting effects of the claimant's symptoms to determine the extent to which the symptoms affect the individual's ability to work. 20 C.F.R. § 404.1529; SSR 96-7p. Because symptoms such as pain are often subjective, a decision fully favorable to the claimant often cannot be made solely on the basis of objective medical evidence. *Id.* As a result, the ALJ must carefully consider the claimant's statements about symptoms along with the rest of the relevant evidence to reach a conclusion. *Id.* When a claimant's statements about the effects of his symptoms cannot be substantiated with objective

16

medical evidence, the ALJ must make a finding about the credibility of the claimant's statements based upon the record as a whole. *Id.*

Should an ALJ discount a claimant's testimony, the ALJ must "articulate specific reasons for discounting [his] testimony as being less than credible." *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005). In making a credibility determination, the ALJ should consider factors including: (1) objective medical evidence; (2) the claimant's daily activities; (3) allegations of pain; (4) aggravating factors; (5) types of treatment received; (6) any medications taken, and (7) functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir.2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96–7p. Any consideration of the claimant's daily activities, however, "must explain perceived inconsistencies between a claimant's activities and the medical evidence." *Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir. 2013) (citing *Jelinek*, 662 F.3d at 812). Moreover, "a person's ability to perform daily activities, especially if they can be done only with significant limitation, does not necessarily translate into an ability to work full time." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

Furthermore, a court is obligated to review the ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Reversal on this ground is appropriate only if the credibility determination is so lacking in explanation or support that it is "patently wrong." *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir.2008).

In determining Dorrance's RFC, the ALJ found Dorrance's testimony about the intensity, persistence, and limiting effects of his back-related and hearing-related symptoms less than credible. To explain, the ALJ pointed to inconsistencies between Dorrance's testimony about his

17

continuing activities, including golf, outdoor activities, and working in the garage, and other evidence, including Dr. Filipowicz's and Dr. Novak's office notes as well as the testimony of Dorrance's girlfriend, which challenge the reliability of Dorrance's statements.

In challenging the ALJ's credibility determination, Dorrance argues that the ALJ inappropriately used Dorrance's continuing activities to show his ability to work. Dorrance defends his golfing by stating that the last time he tried golfing was in 2004. And even then, he claims that he only tried golfing to test it as a form of exercise. Similarly, Dorrance questions the ALJ's reliance on a 2007 episode of pain while fishing and Dorrance's continuing to work in the garage. Dorrance contends that the ALJ misused these facts without sufficient explanation in discounting his credibility about his ability to work.

Dorrance, however, misinterprets the ALJ's use of his continuing activities in the credibility determination. The ALJ did not use those examples to show that Dorrance is capable of working. Instead, the ALJ used those examples to show that Dorrance's testimony was not credible more generally. For instance, the ALJ noted that Dorrance's claim that he last golfed in 2004 conflicts with his report to Dr. Filipowicz suggesting that he injured himself in July of 2010 while "doing a bit of golfing." (Tr. 474). In addition, the ALJ noted that Dorrance's girlfriend's third party report dated December 2009 stating that Dorrance loved to be outdoors and fishing when the weather permitted conflicted with Dorrance's testimony that his fishing incident occurred before his onset date. The ALJ also compared Dorrance testimony, in which he indicated that he had not worked in the garage since 2005 or 2006, to Dr. Novak's 2010 notes, in which he reported that his hearing aids got dirty working in the garage and she directed him not to wear his hearing aids while working in the garage.

18

Given these inconsistencies, the ALJ reasonably questioned the credibility of Dorrance's testimony about the intensity, persistence, and functionally limiting effects of his symptoms. In addition to these inconsistencies, the ALJ also noted that Dorrance alleged a disability onset date of February 2007, with little evidence to support his claims until December 2007, when the medical records show his first complaint of back pain. Considering her explanation in total, the ALJ fulfilled her obligation to demonstrate how Dorrance's documented activities and allegations were inconsistent with the medical evidence. As such, Dorrance has not persuaded the Court the ALJ's credibility assessment was patently wrong. Recognizing, however, that all parts of the RFC determination, including the credibility determination, could be affected on remand, the Court directs the Commissioner to conduct a new credibility determination to the extent required based on the revised analysis discussed above.

### 3. Review of the ALJ's Step Five analysis is unnecessary at this time.

Dorrance's final challenge to the ALJ's decision claims that the ALJ presented incomplete hypotheticals to the VE at his disability hearing because the ALJ's RFC determination was inaccurate. As a result, Dorrance contends that the ALJ's conclusion, in reliance on the VE testiomy, that he could perform the requirements of the occupations of addresser and parking lot cashier was faulty. However, because the RFC determination will be addressed anew on remand necessitating a new Step Five analysis, this Court need not address Dorrance's argument at this time.

## III. CONCLUSION

As explained above, the ALJ's determination that Dorrance's mental impairments were non-severe is supported by substantial evidence. However, the ALJ's RFC determination was not

19

supported by substantial evidence because the ALJ failed to provide a complete explanation for not giving Dr. Filipowicz's treating source opinion controlling weight and to address all the required regulatory factors in reaching that conclusion. Therefore, this case must be remanded for consideration of Dorrance's RFC. While the ALJ's credibility determination was not patently wrong, the Commissioner may need to reach a new credibility determination as part of the new RFC determination.

Therefore, Dorrance's request for remand is **GRANTED** [Doc. No. 15]. This case is **REVERSED** and **REMANDED** to the Commissioner for proceedings consistent with this opinion pursuant to sentence four of 42 U.S .C. § 405(g). The clerk is instructed to term the case.

**SO ORDERED.**

Dated this 27th Day of December, 2013.

    s/Christopher A Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge